IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 16, 2005 Session

**BEN PRUITT**

v.

**CITY OF MEMPHIS AND CITY OF MEMPHIS
CIVIL SERVICE COMMISSION**

**An Appeal from the Chancery Court for Shelby County
No. CH-03-2457-2     Arnold B. Goldin, Chancellor**

_____

**No. W2004-01771-COA-R3-CV - Filed August 24, 2005**

_____

This is an appeal from the trial court's reversal of an administrative decision. The plaintiff police officer was involved in a one-car collision while driving a police van. At the time, he was on sick leave and was not authorized to be driving the van. The van contained numerous high-powered police weapons. After the accident, the officer locked the van and left it at the accident scene overnight. The next day, the officer notified the police department about the accident. The officer was later terminated for his conduct arising out of the accident. The officer appealed his termination to the Civil Service Commission, which upheld the termination. The officer then filed the instant lawsuit in the lower court, seeking a review of the Commission's decision. The trial court reversed the Commission, holding that no material evidence supported its decision to uphold the termination. From that decision, the City now appeals. We reverse the decision of the trial court and uphold the Civil Service Commission's decision to terminate the plaintiff officer, finding material evidence in the record to support the Civil Service Commission's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Sara L. Hall, City Attorney, and Carmalita Carletos-Drayton, Assistant City Attorney, Memphis, Tennessee, for the appellant, City of Memphis.

Thomas E. Hansom, Memphis, Tennessee, for the appellee, Ben Pruitt.

# OPINION

Plaintiff/Appellee Ben Pruitt ("Pruitt") was a police officer with the Police Department for the Defendant/Appellant City of Memphis for approximately nineteen years. At the time of the incident in question, he was employed as an officer in the special operations TACT Unit.[1] As with all TACT Officers, Pruitt was assigned a vehicle and high-powered police weaponry that was kept in the vehicle. Because quick response is required for all members of the TACT Unit, each officer is required to have ready access to his vehicle and his weaponry. Therefore, the vehicle and its contents are normally kept at the officer's home. When the officer is on extended sick leave, the vehicle is kept at the department until the officer returns to work. Pruitt was assigned a blue Dodge van as his TACT Unit vehicle.

On January 21, 2003, Pruitt went on sick leave and, therefore, his van was kept at the East Precinct. Pruitt was scheduled to return to work on February 6, 2003. On February 3, 2003, at about 2:00 a.m., Pruitt had a friend drive him to the East Precinct where he retrieved his van. Since Pruitt was still officially on sick leave at this time, he did not have authority to take the van. Pruitt intended to drive the van to the Central Precinct, where he intended to sleep in the van and report to work the following morning.[2] While en route to the Central Precinct, Pruitt lost control of the van and crashed into a tree in the front yard of a residence at 3424 Radford Road. The front air bag deployed, and Pruitt sustained injuries in the accident. Pruitt did not immediately report the accident to his supervisors, nor did he contact any other member of the police department. Instead, he left the scene of the accident and abandoned the van, which contained his TACT Unit weapons and ammunition. At about noon the next day, Pruitt woke up at his brother's house in Lakeland, Tennessee, remembering little that occurred after the accident or how he got to his brother's house. Pruitt then called the police department and spoke to the secretary regarding the status of the TACT Unit van.

After this incident, the City charged Pruitt with violating several disciplinary rules, including DR-104 Personal Conduct, DR-101 Compliance with Regulations, DR-120 Neglect of Duty, and DR-803 Rough Or Careless Handling Of City or Department Property as a result of the accident.[3] On July 9, 2003, an administrative hearing was conducted, and Pruitt was found guilty on those four charges. As a result, Pruitt was terminated from his position at the police department. Pruitt timely appealed his termination to the Civil Service Commission ("the Commission") in accordance with the City Charter.

---

[1] The TACT Unit is a special operations unit that has officers specially trained to respond to various emergency situations, is responsible for handling barricade situations, hostage rescues, counter terrorism, and high risk felony apprehensions.

[2] Pruitt had been experiencing personal difficulties and, at the time, did not have a permanent residence.

[3] The charge of DR-1101 Feigning Illness was dismissed and is not at issue in this appeal.

On September 19, 2003, the Commission conducted a full hearing on the matter. At the hearing, the Commission heard the testimony of the three persons who were living at the Radford house, Linda Joyce Dixon ("Dixon") and her sons, Reginald Riser ("Reginald"), and Jarvis Jamal Riser ("Jarvis"). Dixon testified first. She said that she heard the impact of the van hitting the tree and looked outside to see whether she could help. She saw Pruitt staggering outside the van just after the accident, and noted that he had blood on his face. She saw Pruitt attempt to push the van off the tree, which was about three feet away from the house, while the van was still running. Dixon told Pruitt that he should turn the van off, but he did not respond. She asked Pruitt if he was okay and whether he wanted her to call an ambulance, but Pruitt "just kept moving about trying to get things from the van and then trying to push the van" and never spoke. Dixon said that Pruitt walked down the sidewalk, then returned to the van and appeared to use his cell phone to call someone. Then she saw him leave the scene and never return.

Reginald and Jarvis told similar versions of the events that transpired. They heard the crash, then went to see what had happened. Reginald said that Pruitt did not appear to be injured, though he saw a spot of blood just below his lip. To Reginald, Pruitt seemed "groggy, pretty much non-coherent. He was like in a daze." Reginald also spoke to Pruitt, but Pruitt never responded. Like Dixon, Reginald saw Pruitt unsuccessfully attempt to move the van off of the tree. He saw Pruitt leave the van for a short time then return and retrieve his cell phone from the van. Jarvis also saw Pruitt after the accident, and testified that he appeared to be injured. He said that Pruitt "was kind of staggering or I would say maybe limping a little bit, and there was blood . . . between his lip and his nose." Like Dixon and Reginald, Jarvis spoke to Pruitt, but Pruitt never responded. He also saw Pruitt leave the scene for a short time. Jarvis said Pruitt returned, got into his van, and picked up his cell phone. Subsequently, Pruitt locked the doors of the van and left the scene. Jarvis called 9-1-1, and the police arrived about ten to fifteen minutes thereafter.

The Commission also heard testimony from Lieutenant Dana Stine ("Lt. Stine"), a scene supervisor who was called to the scene of the accident. She said that she was called to the accident scene because the police officers who responded to the initial 9-1-1 call suspected that the crashed vehicle was a TACT Unit van. She called Major Earnest Dobbins ("Maj. Dobbins") from the TACT Unit, who joined her at the scene with a spare key to the van. They opened the van and found about eight (8) of Pruitt's TACT Unit weapons as well as ammunition inside. Lt. Stine testified that officers have a duty to report accidents in which they are involved, but that she had no knowledge of Pruitt reporting his accident. She did not perform an investigation, but she informed the proper parties who would do so.

Sergeant Michael Cockrell ("Sgt. Cockrell") also testified at the hearing. Sgt. Cockrell was called to the scene as a member of the department's STID (Special Traffic Investigation Squad) and as an accident reconstruction specialist. He and his fellow officers measured the skid marks of the van, took photographs, and considered other observations in an attempt to reconstruct the accident.[4] Sgt. Cockrell also considered the conditions of the road, that it had been raining, and that the van had

---

[4]The skid marks measured 292 feet.

hit the curb and other things before the final impact against the tree. Giving every consideration to the driver, he said, he concluded that the van was traveling at about sixty (60) miles per hour around the "S" curve in the road at the time of the wreck. He noted, too, that there was blood on the airbag of the van.

The Commission also heard the testimony of Maj. Dobbins, the commander of the TACT Unit and Pruitt's supervisor. He was also called to the accident scene, and he observed the TACT Unit van assigned to Pruitt. Maj. Dobbins noted that Pruitt was not authorized to be in the van at the time of the accident, both because he was off sick and because he was not supposed to be driving the van unless he was traveling to or from work. Maj. Dobbins said, at the time, he attempted to contact Pruitt on his cell phone, pager, and home phone, but he was unable to locate him. He said that Pruitt did not contact him at any point during the night regarding the accident, although he had an obligation to do so. Once he obtained access to the inside of the van, Maj. Dobbins saw five high-powered weapons that had been assigned to Pruitt; one had been secured while the others were "just laying on the floorboard." Although the van was locked, Maj. Dobbins said, he did not consider the weapons secure. He said that the TACT Unit weapons should be locked in a secure place when inside the van, and there is an alarm for the van itself. Pruitt's van's alarm did not appear to be activated at the time of the accident.[5]

The investigating officer for the accident, Sergeant Robert Wofford ("Sgt. Wofford"), testified at the hearing. Sgt. Wofford visited the scene of the accident, took photographs and a video of the scene, observed the van, and talked with attending officers and witnesses. He said that the inside of the van contained clothing and weapons and was generally in disarray. The next day, Sgt. Wofford took a statement from Pruitt while Pruitt was at the hospital being treated for his injuries. Pruitt told Sgt. Wofford that "his memory was a little fuzzy about a few things, but he basically recalled the impact, but he didn't recall a whole lot after that." Sgt. Wofford had Pruitt undergo drug and alcohol testing, which showed no drugs or alcohol in his system. Sgt. Wofford did not seek access to Pruitt's medical records or cell phone bills to determine whether he spoke with anyone after the accident. After his investigation, Sgt. Wofford completed a statement of the charges against Pruitt.

District Chief Larry Godwin ("Chief Godwin"), the hearing officer who sustained the charges against Pruitt, also testified at the hearing. He explained that the Neglect of Duty charge against Pruitt was based on the fact that Pruitt had left the high-powered TACT Unit weapons in the van at the scene of the accident. The Personal Conduct charge was based on Pruitt's conduct at the scene of the accident, including his failure to communicate with citizens, his leaving and then returning to the van, and also his leaving the scene of the accident. The Compliance with Regulations charge was sustained, Chief Godwin said, because Pruitt did not notify a supervisor or dispatcher soon after his accident, as was required by regulations. Chief Godwin said that the Rough Or Careless Handling Of City or Department Property charge was sustained, but no action was taken on that

_____

[5]Pruitt later claimed that his alarm was not activated because it was not working. Maj. Dobbins did not check to see whether the alarm was in working order.

-4-

charge because the other charges warranted termination. That charge alone, he said, would not have resulted in termination. Chief Godwin explained that he terminated Pruitt based on a combination of factors. He noted the fact that Pruitt's claimed intent of sleeping in the van until work the next morning was "highly unusual," and also noted that Pruitt left high-powered weapons in the van. He said that more was expected of Pruitt because he was a TACT officer with more training than other officers, and Pruitt was aware of what could happen if "these weapons [got] in the wrong hands." He said that Pruitt was asked whether he had been drinking at the time of the accident. Although Pruitt denied that he drank more than one beer, he volunteered to enter the Second Chance Program for alcohol abusers if that issue was a concern to the department.

On cross-examination, Chief Godwin acknowledged that, prior to this incident, Pruitt had good evaluations, no complaints, and had completed nineteen years of service with a good record. He recognized that Pruitt had told him that he had sustained a concussion in the accident and had no recollection of his conduct after the accident. Nevertheless, Chief Godwin stated, he did not attempt to obtain Pruitt's medical records to verify or rebut this claim.

Pruitt testified at the hearing on his own behalf. He said that he had been experiencing personal problems in the months before the accident, including a demotion, marital problems, a divorce, and bankruptcy.[6] He said he had moved seven or eight times in the previous fifteen months prior to the accident. He said that he drank alcohol more than he had in the past, but he did not drink to excess.

The afternoon before the accident, Pruitt had left his own car to be repaired. He spent the evening with his girlfriend, who brought him to the East Precinct to get his van because he had no other transportation. When Pruitt retrieved the van, he intended to sleep in the van in the parking lot of the Central Precinct and report for work in the morning. He claimed that he had lived in the van from time to time, and that he had slept in it quite a bit.[7] Pruitt maintained that the Department did not have a policy prohibiting him from sleeping in his van.

Pruitt said that, at the time of the accident, it had been raining and he was very sleepy as he went around the "S" curve in front of the house on Radford. He claimed that the last thing he remembered was locking his arms and hitting the concrete median in front of the house. His next memory was waking up at his brother's house, with no recollection of how he got there. Pruitt did not know whether he had his cell phone with him, and he said that he had not received a cell phone bill reflecting whether he had called anyone after the accident. He did not remember trying to push the van away from the tree, and did not remember anyone trying to talk to him at the scene of the accident. The next day, around noon or 1:00 p.m., he called the secretary at the TACT Office to check on the van. His brother then took him to the hospital for treatment of his injuries. Pruitt said

---

[6] He had been promoted to Sergeant, but was demoted because of "litigation that was going on."

[7] Pruitt testified, "[E]verybody was joking with me being in my van, because I was talking about putting a kitchenette in it."

he had a cut in his lip and was "just beat-up looking." He claimed that he had been diagnosed with a concussion, but did not submit any medical documentation of such a diagnosis. Pruitt spoke with the officers who came to the hospital to see him and agreed to the testing that they requested. He said he cooperated fully with the officers and with all other requests made by the department. He said he did not remember taking any of the actions on which the charges against him were based.

A day or two after he left the hospital, Pruitt testified, he consulted with William Oswald, M.D. ("Dr. Oswald"), who treated him for his injuries sustained in the accident. Pruitt did not give any details regarding any diagnosis from Dr. Oswald, other than the fact that Dr. Oswald cleared him to return to work sometime after his visit. Pruitt said that he also sought counseling for the personal problems he had been experiencing.

On November 17, 2003, the Commission issued its written decision, unanimously sustaining the City's termination of Pruitt's employment and finding that the City had a reasonable basis for its decision. The Commission noted that Pruitt attempted to return to work early from sick leave without a note from a physician, and that one of his reasons for attempting to return to work early was because his personal vehicle was not operable and he would be able to use TACT van. After Pruitt had the accident, the Commission found, Pruitt was non-communicative and did not respond to any of the inquiries made by the residents of the house, but he had sufficient mental faculties to lock his van and later retrieve his cell phone. The Commission indicated that it did not credit Pruitt's testimony that the injuries sustained in the crash caused his erratic behavior at the scene of the accident. The Commission concluded:

> Officer Pruitt is not sure how he got to his brother's house, nor has he found out subsequent to the accident. Officer Pruitt intimates that the crash caused his erratic behavior at the scene and amnesia. Nevertheless, he had the presence of mind to secure the van, use his cell phone, and get to his brother's house in Lakeland, Tennessee.

The Commission further determined as a matter of fact that Pruitt was "traveling at an excessive rate of speed," according to the credible testimony of Sgt. Cockrell. Based on that evidence, the Commission sustained the termination of Pruitt's employment.

On December 31, 2003, Pruitt filed a petition for writ of certiorari in the trial court below. On June 24, 2004, the trial court issued an order granting the petition for writ of certiorari and reversing the Commission's decision to uphold Pruitt's termination based on the record of the Commission hearing. The trial court concluded that the action of the City was not supported by material evidence in the record, noting the "unrebutted" proof that Pruitt had lost his cognitive abilities in the accident. The trial court stated:

> [T]he actions of the Respondents in this case are unsupported by competent material evidence in that the consistent claim of Petitioner to injuries sustained in [the] automobile collision which included a concussion and loss of [cognitive] function

for a period of time were unrebutted despite Petitioner's full cooperation with investigators of the Respondent City of Memphis from the outset of the investigation. . . . [T]he four (4) charges on which Petitioner's termination was based . . . specifically dealt with Petitioner's conduct after the collision and as confirmed by the transcript of record filed in this cause.

Thus, the trial court overturned the Commission's decision and ordered that Pruitt be restored to his position with the City with full backpay and benefits. From this order, the City now appeals.

On appeal, the City argues that the trial court erred in reversing the decision of the Commission, because there is material evidence in the record to support the Commission's conclusion. Pursuant to the Tennessee Uniform Procedures Act ("the Act"), the Commission's decision is subject to judicial review in the chancery court. *See* Tenn. Code Ann. § 27-9-114 (2000); Tenn. Code Ann. 4-5-322(b)(1) (Supp. 2004). Under the Act, the trial court's review of the case is without a jury and is confined to the record of the administrative body, except in cases involving procedural errors. Tenn. Code Ann. § 4-5-322(g) (Supp. 2004). The scope of review is set out in subsection (h), which states:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) Unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h) (Supp. 2004). This Court must apply the same standard of review as the trial court upon reviewing an agency's decision. *Gluck v. Civil Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 2000). Therefore, we apply the "substantial and material evidence" standard, determining whether, based on the evidence in the record, there is substantial and material evidence to support the Commission's decision to terminate Pruitt. *Lamarr v. City of Memphis*, No. W2002-02087-COA-R3-CV, 2004 WL 370298, at *2 (Tenn. Ct. App. Feb. 27, 2004). In doing so, we take into account whatever in the record fairly detracts from the weight of the evidence, but we may not substitute our own judgment for that of the agency as to the weight of the evidence on questions of fact. *See City of Memphis v. Owens*, No. 02A01-9109CH00202, 1992 WL 227561, at *1 (Tenn. Ct. App. Sept. 18, 1992). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Lamarr*, 2004 WL 370298, at *2 (quotations omitted). The Commission was in a position to evaluate and weigh the credibility of the

witnesses who testified at the hearing, and the Commission's credibility determinations, therefore, should be given great weight by any reviewing court. *Hayes v. Metropolitan Gov't of Nashville & Davidson County*, No. 01-A-019108CH00291, 1992 WL 40194, at *9 (Tenn. Ct. App. Mar. 4, 1992); *see Lewis v. Metropolitan Gov't of Nashville & Davidson County*, No. 01-A-01-9006CH00220, 1990 WL 205223, at *3 (Tenn. Ct. App. Dec. 18, 1990) ("Resolving conflicting evidence is for the Commission.").

The City argues that there was clearly substantial and material evidence in the record to support the finding that Pruitt was guilty of the charges against him. Specifically, the City challenges the trial court's finding that Pruitt's erratic behavior was the result of a concussion or amnesia sustained in the accident, noting that there was no evidence in the record other than Pruitt's assertions to support that claim. Rather, the City argues, the Commission was entitled to reject Pruitt's stated defense in light of all the other evidence submitted at the hearing. In response, Pruitt argues that he was diagnosed with a concussion, that he could not remember his post-accident conduct, and that this evidence was unrebutted. He claims that, in order to reject this testimony, the City had the responsibility to disprove it by medical evidence or otherwise. Because the City did not attempt to obtain his medical records or investigate his claim, Pruitt maintains, then there is no material evidence to support his termination.

After reviewing the record in detail, we must agree with the appellant City that there is clearly material evidence in the record to support Pruitt's termination. Other than Pruitt's own testimony, there is no other proof in the record to support his claim that the injuries he sustained in the accident significantly altered his cognitive abilities. The evidence is undisputed that Pruitt committed the acts with which he is charged, *i.e.*, leaving the van unsecured and leaving the weapons unsecured, leaving the scene of the accident, and failing to report the accident. The onus at that point was on Pruitt to prove his defense, that the accident had so impaired his cognitive ability that he should not be held accountable for his actions. To do so, Pruitt offered only his bare assertion, with no corroborative evidence. The Commission noted specifically that, although Pruitt claimed that he did not remember post-accident details, he "[n]evertheless had the presence of mind to secure the van, use his cell phone, and get to his brother's house in Lakeland, Tennessee." That finding was effectively a credibility determination against Pruitt. Even if we do not agree with the Commission's credibility determination or if we believe the decision to terminate was unduly harsh in light of Pruitt's record prior to the accident, we are not free to substitute our judgment for that of the Commission. *See Owens*, 1992 WL 227561, at *1. We must conclude that the Commission's decision is supported by substantial and material evidence in the record. Therefore, we reverse the holding of the trial court and uphold the decision of the Commission sustaining the termination.

The decision of the trial court is reversed, and the decision of the Commission is upheld. Costs on appeal are to be taxed to Appellee Ben Pruitt, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE